UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH S., | Case No.:  22-cv-1176-LL-MMP |
| Plaintiff, | **REPORT AND RECOMMENDATON REGARDING JOINT MOTION FOR JUDICAL REVIEW** |
| v. | |
| MARTIN O'MALLEY, Commissioner of the Social Security Administration, | [ECF No. 17] |
| Defendant.[1] | |

This matter comes before the Court for a Report and Recommendation ("R&R") on the parties' Joint Motion for Judicial Review of Final Decision of the Commissioner of Social Security. [ECF No. 17.] Plaintiff Joseph S. ("Plaintiff") appeals the final decision of the Commissioner of Social Security denying his application for Supplemental Security Income benefits under Title XVI of the Social Security Act. [ECF No. 1, ¶¶ 1, 6–11.] Plaintiff brings his appeal pursuant to 42 U.S.C. § 405(g).

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Martin O'Malley, the current Commissioner of Social Security, is automatically substituted as the defendant for Kilolo Kijakazi, the former Acting Commissioner of Social Security.

1

After a thorough review of the parties' submissions, the administrative record, and the applicable law, the Court **RECOMMENDS** that the District Judge **REVERSE** the Commissioner's denial of supplemental security benefits and **REMAND** for an immediate award of benefits.

# I. PROCEDURAL HISTORY

Plaintiff filed an application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, alleging a disability onset date of May 9, 2018. [ECF No. 1, ¶¶ 6–7]; Administrative Record ("AR") 267–83. The claim was denied initially on April 3, 2020, and upon reconsideration on November 24, 2020. AR 138, 147. Plaintiff filed a written request for hearing. AR 162.

On September 8, 2021, the Administrative Law Judge ("ALJ") held a telephonic hearing on the matter in which Plaintiff, appearing with counsel, testified at the hearing, as well as a vocational expert. AR 30. On September 23, 2021, the ALJ issued a decision denying benefits. AR 12–24. On November 1, 2021, Plaintiff filed a request for Appeals Council review, which was denied on June 7, 2022. AR 1–6. Accordingly, the ALJ's decision is the final decision of the Commissioner of Social Security.

# II. SUMMARY OF ALJ'S FINDINGS

## A. The Five-Step Evaluation Process

The ALJ follows a five-step sequential evaluation process in assessing whether a claimant is disabled. 20 C.F.R. § 416.920; *see also* § 404.1520 (establishing five-step sequential process for disability benefits); *Tackett v. Apfel*, 180 F.3d 1094, 1098–99 (9th Cir. 1999). In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled, and the claim is denied. 20 C.F.R. § 416.920(a)(4)(i), (b).

If the claimant is not currently engaged in substantial gainful activity, the second step requires the ALJ to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting his ability to do basic work activities, and which has lasted or is expected to last for a continuous period of at least twelve (12)

months; if not, the claimant is not disabled and the claim is denied. 20 C.F.R. § 416.920(a)(4)(ii), (c); § 416.909 (setting forth the twelve (12) month duration requirement). If the claimant has a "severe" impairment or combination of impairments, the third step requires the ALJ to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R. § 404, subpart P, appendix 1; if so, disability is conclusively presumed, and benefits are awarded. 20 C.F.R. § 416.920(a)(4)(iii), (d).

If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the ALJ proceeds to the fourth step of the disability evaluation process. 20 C.F.R. § 416.920(e). The fourth step requires the ALJ to determine whether the claimant has sufficient residual functional capacity ("RFC") to perform his past work. 20 C.F.R. § 416.920(a)(4)(iv). Therefore, the ALJ must determine the claimant's RFC before moving to step four.

An RFC is "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." Soc. Sec. Ruling ("SSR") 96-8p, 1996 WL 374184, at *1 (S.S.A. 1996). It reflects the most a claimant can do despite his limitations. 20 C.F.R. § 416.945(a)(1); *see Smolen v. Chater*, 80 F.3d 1273, 1291 (9th Cir. 1996). An RFC assessment must include an individual's functional limitations or restrictions as a result of all of his impairments – even those that are not severe – and must assess his "work-related abilities on a function-by-function basis." SSR 96-8p, 1996 WL 374184, at *1; 20 C.F.R. § 416.945(a)(1)–(2), (e); *see also Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009) ("[A] n RFC that fails to take into account a claimant's limitations is defective"). An RFC determination must be based on "all the relevant evidence" including the diagnoses, treatment, observations, and opinions of medical sources. 20 C.F.R. § 416.945(a)(1)–(3). A court must uphold an ALJ's RFC assessment when the ALJ has applied the proper legal standards and substantial evidence in the record as a whole supports the decision. *See Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005). An ALJ, however, errs when he provides an

incomplete RFC that ignores or discounts "significant and probative evidence in the record" favorable to a claimant's position. *Hill v. Astrue*, 698 F.3d 1153, 1161 (9th Cir. 2012).

At step four of the sequential process, if the ALJ determines a claimant has sufficient RFC to perform past relevant work, the claimant is not disabled, and the claim is denied. 20 C.F.R. § 416.920(a)(4)(iv), (f)–(g).

At step five, the burden then shifts to the ALJ to establish that the claimant is not disabled because there is other work existing in "significant numbers" in the national economy" the claimant can do, taking into account the claimant's RFC, age, education, and work experience. 20 C.F.R. § 416.960(c); *see also* 20 C.F.R. § 416.920(a)(4)(v), (g)(1); *see Hill*, 698 F.3d at 1162. The ALJ usually meets this burden either (1) by the testimony of a vocational expert who assesses the employment potential of a hypothetical individual with all of the claimant's physical and mental limitations that are supported by the record, or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R. part 404, subpart P, appendix 2. *Id*. The determination of this issue comprises "the fifth and last step" in the sequential analysis. 20 C.F.R. § 416.920(a)(4)(v).

### B.    The ALJ's Application of the Five-Step Process

At step one of the five-step process, the ALJ found Plaintiff had not engaged in substantial gainful activity since the application date of August 27, 2019. AR 17.

At step two, the ALJ found that Plaintiff has the following severe impairments: "schizoaffective disorder (bipolar type), major depressive disorder, generalized anxiety disorder, PTSD, and substance use disorder (cannabis)." AR 18.

At step three, the ALJ found Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments" in Social Security's Listing of Impairments 12.03, 12.04, 12.06, and 12.15. *Id.* (citing 20 CFR Part 404, Subpart, Appendix 1).

The ALJ then found that Plaintiff had the RFC to perform "a full range of work at all exertional levels but with the following nonexertional limitations: limited to simple,

routine, repetitive tasks performed in a work environment free of fast-paced production requirements involving only simply work-related decisions and routine workplace changes; only occasional interaction with coworkers and supervisors; no interaction with the public; avoid all use of hazardous moving machinery; and avoid all exposure to unprotected heights." AR. 20.

At step four, the ALJ determined Plaintiff had no past relevant work. AR 22.

At step five, the ALJ determined Plaintiff could perform other work that exists in significant numbers in the national economy such as hand packer (Dictionary of Occupational Tiles ("DOT") No. 920.587-018, warehouse worker (DOT No. 922.687-058), and cleaner II (DOT No. 919.687-014). AR 23.

Thus, the ALJ determined Plaintiff had "not been under a disability, as defined in the Social Security Act, since August 27, 2019." *Id*.

## III.   STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this Court has authority to review the Commissioner's decision to deny benefits. The Commissioner's decision will be disturbed only if "it is either not supported by substantial evidence or is based upon legal error." *Woods v. Kijakazi*, 32 F.4th 785, 788 (9th Cir. 2022) (quoting *Luther v. Berryhill*, 891 F.3d 872, 875 (9th Cir. 2018)).

The substantial-evidence standard requires a reviewing court to "look to the existing administrative record and ask whether it contains sufficient evidence to support the agency's factual determinations." *Woods*, 32 F.4th at 788 (citing *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019)) (internal quotation marks omitted). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek*, 139 S. Ct. at 1154 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The standard requires "more than a mere scintilla" of evidence, "but less than a preponderance." *Revels v. Berryhill*, 874 F.3d 648, 654 (9th Cir. 2017) (citation omitted). "Overall, the standard of review is highly deferential." *Kitchen v. Kijakazi*, 82 F.4th 732, 738 (9th Cir. 2023); *see also Valentine*, 574 F.3d at 690. Thus, "[w]here

evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld." *Woods*, 32 F.4th at 788 (quoting *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005)).

However, the Court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." *Garrison v. Colvin*, 759 F.3d 995, 1009 (9th Cir. 2014). The ALJ is responsible for determining credibility and resolving conflicts in medical testimony as well as any ambiguities in the record. *Id.*; *see also Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989). The Court will "review only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely." *Garrison*, 759 F.3d at 1010; *see also Collings v. Saul*, 856 F. App'x 729, 730 (9th Cir. 2021).

The Court may also overturn the Commissioner's denial of benefits if the denial is based on legal error. *Garcia v. Comm'r of Soc. Sec.*, 768 F.3d 925, 929 (9th Cir. 2014). However, even if the Court finds the ALJ committed legal error, a court may not reverse an ALJ's decision if the error is harmless, "which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." *Id.* at 932 (internal quotations and citation omitted); *see also Burch*, 400 F.3d at 679 (citation omitted).

## IV.   ANALYSIS

Plaintiff presents the following disputed issues: (1) whether the ALJ properly evaluated Plaintiff's symptom testimony; (2) whether the ALJ properly evaluated the medical opinions of treating psychiatrist Scott Bunner, M.D., and consultative examiner Madhumalti Bhavsar, M.D.; and (3) whether the ALJ adequately supported his finding that Plaintiff did not meet Listing 12.03. The Court addresses each issue in turn.

**A.      Whether the ALJ Properly Evaluated Plaintiff's Symptom Testimony**

1.      <u>Plaintiff's Subjective Statements</u>

In a Function Report dated October 30, 2019, AR 342–49, Plaintiff stated that he cannot control his thoughts and hears voices, noises, and sounds such as music. AR 342. He forgets constantly, including in the middle of a thought. *Id*. Plaintiff played video games somewhat, though he struggled to play certain games; he was able dress and clean himself; and he followed his caretaker's instructions as best as he can. AR 343, 348. He needed reminders to take medications and also forgot that he already took his medication. AR 344. Plaintiff did not prepare his own meals. *Id*. He was able to do certain household chores such as dumping trash and vacuuming, though he needed to be told exactly what to do. *Id*.

Plaintiff also explained that he went to the store once per week for approximately thirty minutes to shop for food or to the church or park. AR 345, 348. For these limited outings, he only went when accompanied by his caretaker. *Id*.; *see* AR 345. Otherwise, he did not generally go outside because he was scared of shootings. AR 345, 348. Plaintiff did not have his driver's license and was not able to manage his own money. AR 345. He stated that he has difficulty communicating, concentrating, remembering, understanding, following instructions, and completing tasks. AR 346.

Plaintiff testified by telephone at the September 8, 2021 hearing before the ALJ. AR 32–33, 38–55. When the ALJ asked what is the main thing that prevents or limits his ability to work, Plaintiff explained that he hears music throughout the day – "It holds along with my brain, and I can't stop the music in my head. . ." AR 44–45. He testified that it was "very hard" for him to remember things on the task, and that he "space[s] out" and the songs in his head "overwhelm" his brain, affecting his ability to concentrate and focus. AR 48. As Plaintiff was responding to the ALJ's questions, he forgot his response mid-thought. *See* AR 45 ("I have music in my head and it's – it's very – it's – it's hard to – to – I forgot what I was talking about. Sorry."). In fact, at numerous points during the testimony, the ALJ had to explain to him to listen and try to respond to the question asked, and in response Plaintiff stated it was hard for him to remember things. *See, e.g.*, AR 42.

Plaintiff then continued to explain that he hears and talks to voices in his head, including a "virtual light being" named Sayyids who watches over him and tells him to do things. AR 45. He testified that he had difficulty sleeping because of the music and voices in his head overwhelm him, and he had to take sleep medication. AR 54. He testified that he was often very tired and had to take a daily three-hour nap. AR 54–55.

Plaintiff testified that he had anxiety, which is triggered by dangerous or challenging things. AR 46–47. He testified that he had feelings of depression weekly about different, personal things and provided examples such as his sister and the pandemic. AR 46. For both his anxiety and depression, Plaintiff testified it occurred randomly, off and on. AR 46–47. He testified that when he had anxiety, he experienced shortness of breath. AR 48.

Plaintiff testified that he did not have a driver's license and relied on his caretaker to drive him to the store or other places he needed to go. AR 39–40. He also testified that his caretaker assisted him with his daily chores by walking Plaintiff through them and sometimes had to remind Plaintiff to shower or bathe. AR 48, 54. He testified that he did not cook or partake in social activities other than things like walking into church to say prayers when accompanied by his caretaker. AR 49–50. Plaintiff testified that when out of the house with his caretaker at church or at the store, he felt "very paranoid" and had to leave early or take a break due to feeling overwhelmed by voices or paranoia. AR 53–54. He also testified that he watched TV and plays video games a few times a week for approximately two hours, though he sometimes struggled when playing and lost concentration. AR 50–51, 53.

Plaintiff testified he was taking two prescription medications, Risperidone and Sertraline, and that he did not believe he had any side effects to the medications. AR 44. He drank beer occasionally, sometimes once a week or sometimes went without drinking for three weeks, and he used marijuana occasionally, once per week, because it helped with anxiety. AR 52.

### 2.   The ALJ's Consideration of Plaintiff's Testimony

In summarizing Plaintiff's testimony, the ALJ found Plaintiff "cannot work due to depressed and anxious moods with mood swings, auditory (music) and visual hallucinations, forgetfulness, inattentiveness, agoraphobia, and paranoia" and "has trouble with understanding and following directions, concentrating, remembering information, and coping with stress and changes in routine." AR 20. The ALJ then found Plaintiff "is physically able to do all personal care tasks and most domestic chores, but he often lacks the motivation or forgets to do them, and he often needs supervision with even basic tasks." *Id*. The ALJ then stated Plaintiff "is able to do some mentally demanding tasks, such as play video games, shop for necessities, attend some social activities (e.g., church), and watch TV, but he never passed his driving test, he cannot manage his finances without help, and being in public causes panic attacks." *Id.*

The ALJ found Plaintiff's "medically determinable impairments could reasonably expected to cause the alleged symptoms" but his "statements concerning the intensity, persistence and limiting effects" of his symptoms were "not fully supported for the reasons explained in this decision." AR 21. The ALJ reasoned that "[t]he evidence of record supports a finding that the claimant's mental impairments cause moderate social, cognitive, and adaptive limitations as reflected in the above residual functional capacity." AR 21. The ALJ then provided the following two reasons for discounting Plaintiff's subjective testimony. First,

> [Plaintiff] consistently showed signs of depressed and anxious moods with memory problems, blunted affect, slow motor activity, monotone speech, paranoia, poor insight or judgment, and indicia of auditory hallucinations, as well as episodes of disorganized or tangential thoughts and concentration problems (B2F, 1, 17; B4F, 41, 63, 87, 89, 91, 94, 96, 98, 100, 103; B7F, 2, 7). However, aside from appearing to have below average intellect and poor abstraction, he consistently appeared grossly mentally normal and stable, showing no signs of acute behavioral problems, communication deficits, loss of orientation, impaired thought processes or processing speed, or active suicidal or homicidal ideation (*Id.*).

AR 21. Second, the ALJ concluded Plaintiff's "psychological symptoms were treated conservatively with outpatient psychotherapy and psychotropic medications." AR 21.

### 3.   The Parties' Arguments

Plaintiff argues the ALJ erred by (1) failing to provide specific, clear, and convincing reasons to discount Plaintiff's testimony; (2) improperly concluding, without adequate support or explanation, that Plaintiff appeared "grossly mentally normal and stable" with no signs of acute behavioral problems, communications deficits, or impaired thought processes or processing speed, and such a conclusion inherently contradicts the ALJ's other express finding; and (3) improperly characterizing Plaintiff's treatment as "conservative."

Defendant contends the ALJ reasonably determined that Plaintiff' statements were not fully supported by the record, relying on Plaintiff's normal mental status exams and conservative treatment.

### 4.   Applicable Law

The Ninth Circuit has established a two-step analysis for evaluating a claimant's subjective symptom testimony. *See Zuniga v. Saul*, 801 F. App'x 465, 466 (9th Cir. 2019) (citing *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009)). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Garrison*, 759 F.3d at 1014 (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035–36 (9th Cir. 2007)). The claimant must only prove that the impairment reasonably could be expected to produce some degree of pain or other symptom; he is not required to prove that the impairment reasonably could be expected to produce the alleged degree of pain or other symptoms. *See Garrison*, 759 F.3d at 1014 (quoting *Smolen,* 80 F.3d at 1282). Moreover, the claimant is not required to produce "objective medical evidence of the pain or fatigue itself, or the severity thereof." *Id.*

If the claimant satisfies the first step "and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if she gives 'specific, clear and convincing reasons' for the rejection." *Zuniga*, 801 F. App'x at

466 (quoting *Lingenfelter*, 504 F.3d at 1036). The Ninth Circuit has reiterated that "[t]his is not an easy requirement to meet: 'The clear and convincing standard is the most demanding required in Social Security cases.'" *Garrison*, 759 F.3d at 1015 (quoting *Moore v. Comm'r of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)); *see Glanden v. Kijakazi*, 86 F.4th 838, 846 (9th Cir. 2023).

"Ultimately, the 'clear and convincing' standard requires an ALJ to show his work. *Smartt v. Kijakazi*, 53 F.4th 489, 499 (9th Cir. 2022). "The ALJ must state specifically which symptom testimony is [discounted] and what facts in the record lead to that conclusion." *Smolen*, 80 F.3d at 1284; *Brown-Hunter v. Colvin*, 806 F.3d 487, 489 (9th Cir. 2015) (holding "an ALJ does not provide specific, clear, and convincing reasons for rejecting a claimant's testimony by simply reciting the medical evidence in support of his or her residual functional capacity determination"). "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Roberts v. Saul*, 829 F. App'x 757, 760 (9th Cir. 2020) (quoting *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995), *superseded by regulation on other grounds*); *see also Lambert v. Saul*, 980 F.3d 1266, 1268 (9th Cir. 2020) ("Under our cases, the ALJ must identify the specific testimony that he discredited and explain the evidence undermining it."). The ALJ's findings must be "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit [Plaintiff's] testimony." *Werlein v. Berryhill*, 725 F. App'x 534, 535 (9th Cir. 2018) (quoting *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2018)). If substantial evidence supports the ALJ's finding, the court may not second-guess the ALJ's decision. *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) (citing *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999)).

Neither party contests the ALJ's determination that Plaintiff has the following severe impairments: "schizoaffective disorder (bipolar type), major depressive disorder, generalized anxiety disorder, PTSD, and substance use disorder (cannabis)." AR 18. Because the ALJ determined that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms"—a finding that is not contested by

either party—the first part of the ALJ's inquiry regarding Plaintiff's subjective complaints is satisfied. *See* AR 21; *Lingenfelter*, 504 F.3d at 1036. Further, neither party alleges that Plaintiff was malingering. [*See* ECF No. 17.] As a result, the Court must determine whether the ALJ provided clear and convincing reasons for discounting Plaintiff's subjective claims regarding his symptoms. *See Lingenfelter*, 504 F.3d at 1036.

5.    <u>Analysis</u>

As discussed below, none of the ALJ's purported reasons for discounting Plaintiff's subjective complaints constitute "specific, clear, and convincing reasons" supported by substantial evidence.

a.    Medical Records

In discrediting Plaintiff's symptom testimony, the ALJ first stated "[t]he evidence of record supports a finding that the claimant's mental impairments cause moderate social, cognitive, and adaptive limitations as reflected in the above residual functional capacity." AR 21. The ALJ then found:

> During treatment within the period under adjudication, the claimant consistently showed signs of depressed and anxious moods with memory problems, blunted affect, slow motor activity, monotone speech, paranoia, poor insight or judgment, and indicia of auditory hallucinations, as well as episodes of disorganized or tangential thoughts and concentration problems (B2F, 1, 17; B4F, 41, 63, 87, 89, 91, 94, 96, 98, 100, 103; B7F, 2, 7).

AR 21. Immediately following, the ALJ concluded:

> However, aside from appearing to have below average intellect and poor abstraction, he consistently appeared grossly mentally normal and stable, showing no signs of acute behavioral problems, communication deficits, loss of orientation, impaired thought processes or processing speed, or active suicidal or homicidal ideation (*Id.*).

AR. 21. Plaintiff contends this conclusion is not only inherently contradictory of the ALJ's finding in the sentence immediately preceding but also not supported by substantial evidence in the record. [ECF No. 17 at 26–29.]

Defendant maintains the ALJ reasonably determined Plaintiff's statements were not fully supported by the record, citing Plaintiff's normal mental status exams and conservative treatment, and that Plaintiff's complaints about debilitating impairments conflicted with his generally unremarkable exam findings on multiple occasions. [*Id.* at 29–30.] Defendant asserts the ALJ "agreed that Plaintiff had severe mental impairments and accounted for them in the RFC finding by including many nonexertional limitations." [*Id.* at 30.]

Because the parties' arguments on all three disputed issues refer to the portions of the medical records cited by the ALJ for this finding, the Court discusses them in detail.

### i.   Plaintiff's Treatment Records Relied on by the ALJ[2]

On August 1, 2019, Dr. Bunner conducted a medical examination of Plaintiff. AR 517–18. Dr. Bunner noted Plaintiff had improved feelings after changing medications from Olanzapine and that he went to swap meets with his caretaker/friend on the weekend but "[was] distracted there by frequent AH [auditory hallucinations] and music hallucinations" and had "trouble with recent memory and concentration." AR 517. Plaintiff reported his

---

[2] The administrative record contains additional medical records dating back to March 2018, *see e.g.*, AR 432–56, 500–15, that pre-date the portion of the records relied on by the ALJ. Plaintiff also had numerous inpatient psychiatric hospitalizations. The ALJ found "[a]lthough he presented with more serious psychological anomalies prior to the application date, those findings are too remote to establish the claimant's mental functioning within the period under adjudication." AR 21. Neither party challenges this finding, ECF No. 17, so the Court focuses its analysis on the records cited by the ALJ to support his conclusion.

The Court notes that it agrees with the ALJ's determination that the prior records show "serious psychological anomalies." For example, on September 11, 2018, Mental Health Clinician Christine Clark found Plaintiff was "impaired without significant assistance from NCMHC and his companion" and "at a high risk for hospitalization without his medications and support from [his caretaker]." AR 454–56. Similar to the treatment records relied on by the ALJ, Plaintiff was consistently found to have paranoia, auditory hallucinations, depression and anxiety, disorganized thoughts, "poverty of thought and speech," flat affect, and poor eye contact. *See, e.g.*, AR 502, 504, 507, 509, 511, 513.

auditory hallucinations and paranoia were rated an 8, and he was "bothered" by them. *Id.* Plaintiff reported using marijuana every other day for depression. *Id.* After conducting a psychiatric exam, Dr. Bunner found Plaintiff's mood was "mildly depressed, mildly anxious, affect is restricted" and Plaintiff was experiencing "mild" auditory hallucinations and paranoia, while Plaintiff's thoughts were goal directed and speech was regular. *Id.* Dr. Bunner increased Plaintiff's Risperidone to "6mg qhs" noting the medication change was "for AH and paranoia which make it difficult to concentrate, remember and work." AR 518.

Dr. Bunner treated Plaintiff again in person on August 29, 2019, finding Plaintiff was "more paranoid," noting he would no longer go to the swap meet with his friend/caretaker due to "worrying someone will shoot him." AR 519. Plaintiff was still depressed and experiencing crying spells once a week. *Id.* Plaintiff had trouble focusing and also became anxious and sweaty while playing online video games. *Id.* With respect to his medication, Dr. Bunner noted that the increase in Risperdal helped "a little" with auditory music "but he is more paranoid" and that Plaintiff was willing to try an increase in medication for psychosis. Dr. Bunner also noted Plaintiff's marijuana use was occasional as he was trying to quit. *Id.* The psychiatric exam found Plaintiff's mood to be depressed and anxious, with a flat affect, and that Plaintiff had the "usual" auditory hallucinations and paranoia as well as "poverty of thought," though he exhibited good eye contact. *Id.*

That same day, Mental Health Clinician Michelle Pomeroy, Licensed Marriage Family Therapist, conducted a Behavioral Health Assessment on behalf of the County of San Diego Mental Health Services. AR 402–22; *see also* 457–77 (same records). Plaintiff presented with "seemingly poor hygiene and grooming" as well as "poor eye contact, anxious mood, and blunted affect." AR 402. The treatment records indicate Plaintiff "had some difficulty understanding some questions and presented with tangential thought process." *Id.* Plaintiff reported experiencing "daily mood symptoms such as sadness, hop[e]lessness, worthlessness and occasional crying spells" as well as daily auditory and visual hallucinations. *Id.* Plaintiff reported that he did not leave his home often because he

was scared of going into crowds and paranoid of shootings. *Id.* Clinician Pomeroy noted that Plaintiff had a history of seven or eight past psychiatric hospitalizations, "though none in the last year due to his med compliance." AR 421. The treatment records indicate "symptoms impair client's social vocational functioning and his ability to complete ADLs such as hygiene and cooking." AR 402; *see also* AR 421 ("psychosis such as AH, VH, PI daily that impair his ability to socialize, work, and complete ADLs."). On the "Mental Status Exam" form, the examiner checked the following boxes: lethargic, normal orientation, poor hygiene, slurred and soft speech, tangential thought process, blunted affect, below average intellect, poor abstraction, depressed mood, poor recent and remote memory, slowed/decreased motor, poor judgment, poor insight, auditory and visual hallucinations, and delusions. AR 416–17. The treatment records separately noted that Plaintiff "had some difficulty understanding." AR 417.

Dr. Bunner treated Plaintiff in person on October 24, 2019. AR 521–22. Plaintiff claimed he was "still paranoid," though he believed his paranoia and auditory hallucinations were "a little better." AR 521. The record noted Plaintiff continued to play video games, vacuumed once a week, resumed going to the swap meet and shopping, and helped with laundry. *Id.* The psychiatric exam found Plaintiff's mood was anxious, his affect was restricted and blunted, he had "usual AH and paranoia," his thoughts were goal directed, and he exhibited poor eye contact. *Id.* Dr. Bunner found Plaintiff's response to medication was "poor" and that Plaintiff "decline[d] any changes in spite of continued psychosis." AR 521–22.

On December 27, 2019, Plaintiff returned for an in-person examination with Dr. Bunner. AR 524–25. Plaintiff reported that he was learning to sell and buy diamonds including at the swap meet and playing video games. AR 524. Dr. Bunner noted that Plaintiff declined a change in medication. *Id.* The psychiatric exam found Plaintiff's mood was euthymic, his affect was blunted, he had "some" auditory hallucinations and paranoia, he denied suicidal ideation, his thoughts were "mildly disorganized," and his speech was regular. *Id.*

Plaintiff had a telephonic appointment with Dr. Bunner on March 20, 2020 due to COVID precautions. AR 526–27. Dr. Bunner found Plaintiff still had "some" auditory hallucinations and paranoia, though he was stable on his current medications and declined any changes. AR 526. Dr. Bunner further noted that Plaintiff was staying inside and trying not to get COVID-19. *Id.* The psychiatric exam found Plaintiff's mood was "mildly anxious, mildly depressed," his affect was blunted, and he had "some poverty of thought," "some" auditory hallucinations and paranoia," no suicidal ideation, and monotone speech. *Id.* Dr. Bunner found Plaintiff's response to medication was "good" and noted "no changes he is stable." AR 526–27.

On June 12, 2020, Dr. Bunner examined Plaintiff again by phone. AR 528–29; s*ee also* AR 400–01 (same records). Plaintiff complained he was "very paranoid and isolate[ed]" and more anxious from COVID and protests, and he was exercising less, playing video games, streaming movies, and doing church at home. Dr. Bunner also noted Plaintiff had not used marijuana recently. AR 528. The psychiatric exam found Plaintiff's mood was anxious, Plaintiff was experiencing some auditory hallucinations and paranoia, though his thoughts were goal directed and his speech was regular. *Id*. Further, Plaintiff declined changes in medication "because he [was] afraid to change anything currently with Covid-19." *Id.*

On September 3, 2020, Mental Health Case Management Clinician Vernette Christian, Associate Marriage Family Therapist, conducted a telephonic Behavioral Health Assessment on behalf of the County of San Diego Mental Health Services of Plaintiff, noting Plaintiff's caregiver spoke at times on behalf of Plaintiff. AR 478–99. Plaintiff presented "Ox4, alter, coherent, and able to track phone conversation," and he reported difficulty focusing and concentrating with auditory hallucinations of voices consisting of "male and female in form of whispers." AR 478. Plaintiff reported continuing to take his medications as prescribed without daily help and having occasional crying spells but denied "mood symptoms such as sadness, hop[e]lessness, worthlessness, and feeling emotional and teary eyed." *Id*. Clinician Christian found Plaintiff "continue[d] to meet

clinic criteria and benefits from continued treatment to prevent decompensation which could lead to higher level of care" and noted Plaintiff's "substance use appears to exacerbate his psychosis and impulse control." AR 478, 485. On the "Mental Status Exam," the examiner checked the following boxes: Plaintiff had auditory hallucinations (with "voices male and female" typed in), flat affect, depressed mood, limited insight, though he appeared to be alert, cooperative, had coherent thought process, and normal orientation, speech, memory, and motor. AR 493. For "other observations," Clinician Christian separately noted that Plaintiff "had some difficulty understanding." AR 494. Further, the "Clinical Formulation" section of this same assessment found Plaintiff "continue[d] to meet criteria for Schizoaffective D/O due to mood symptoms such as hopelessness, sadness, and feeling emotional and teary eyed and psychosis such as AH and PI daily that impair his ability to socialize, work, and complete ADLs"; that he continued to smoke marijuana several times per week and meet criteria for cannabis abuse; and Plaintiff "continue[d] to meet medical necessity for specialty mental health services due to severity of symptoms and risk of decompensation." AR 498.

On September 9, 2020, Dr. Bunner treated in person Plaintiff. AR 530–31. Dr. Bunner noted Plaintiff still had some auditory hallucinations and paranoia and that he was going to mass sometimes outside or at home, streaming movies, playing video games, and going to the swap meet with his caregiver. AR 530. Plaintiff believed his medication was helpful and declined a change in medication because his auditory hallucinations and paranoia were "tolerable." *Id.* The psychiatric exam found Plaintiff's mood was "depressed, anxious," his affect was restricted, he continued to experience "some" auditory hallucinations and paranoia, though thoughts were goal directed, speech was regular, and he exhibited good eye contact. AR 530. Dr. Bunner further recommended Plaintiff switch from marijuana to CBD "to reduce paranoia" and noted there were no changes to his current medication as "he [was] stable and decline[d] changes." AR 531.

Plaintiff treated with Dr. Bunner by phone on January 7, 2021. AR 533. Plaintiff continued to have some paranoia, and Dr. Bunner noted that he was isolated due to the

pandemic. AR 533. He also noted Plaintiff's marijuana use was "every few days for mood and anxiety." *Id.* The psychiatric exam found Plaintiff's mood was "mildly depressed, mildly anxious" and Plaintiff was still experiencing "some mild AH and some paranoia." *Id*. The exam further found Plaintiff had no suicidal ideation, Plaintiff's thoughts were goal directed, and his speech was regular. *Id*. Dr. Bunner further noted that Plaintiff "decline[d] any changes" to his medication. AR 534.

On April 12, 2021, Dr. Bunner examined Plaintiff and concluded his mood was "stable but paranoia significant." AR 543. Plaintiff reported overheating and sweating, which Dr. Bunner found could be a side effect from the Sertraline medication. *Id.* Plaintiff reported played video games and did pushups but "little else"; he stopped going to the swap meet due to COVID; and his marijuana use was "cut down" to "once a week." AR 543–44. Dr. Bunner further noted that Plaintiff had mild auditory hallucinations "but his paranoia is strong and keeps him isolated at home" and that Plaintiff's fear of catching COVID-19 worsened his paranoia. AR 543. The psychiatric exam found his mood was "dysphoric, anxious," affect was flat, he had mild auditory hallucinations but "significant" paranoia, and he had "some poverty of thought," though his thoughts were "linear." *Id.* Dr. Bunner also found Plaintiff exhibited "fair to poor eye contact," was "oriented x3," and had slow and quiet speech. *Id*.

Dr. Bunner treated Plaintiff in person again on July 23, 2021. AR 548–49. Dr. Bunner noted that Plaintiff "continued to be bothered by daily paranoia and auditory hallucinations," had "some depression but is not suicidal," and "struggle[d] with all initiative." AR 548. Although Plaintiff reported that he would occasionally go to the store, he no longer went to swap meets anymore due to COVID. *Id.* After conducting a psychiatric exam, Dr. Bunner found Plaintiff alert and "oriented times 3" and cooperative, though his mood was depressed and anxious. Plaintiff had flat affect, "poverty of thought and speech;" and poor eye contact. *Id.* His speech was "slow, monotone, and quiet." *Id.* Dr. Bunner's treatment notes indicated Plaintiff denied suicidal ideation. *Id.* Dr. Bunner further found Plaintiff had "continued and daily auditory hallucinations and paranoid

delusions which keep them isolated and inside" as well as poor concentration, and Plaintiff's "recent and remote memory [were] impaired." *Id.* Dr. Bunner also noted that although Plaintiff had a fair response to medication, he continued to have "significant symptoms" and denied side effects. AR 549. Plaintiff declined any medication changes. *Id.* Dr. Bunner instructed Plaintiff to "continue significant dose of Risperdal to help with psychosis" noting that Plaintiff "gets partial relief, but does not wany any other changes." *Id.* In addition, Plaintiff was instructed to continue Sertraline for depression and anxiety, noting he had "partial relief of symptoms, but again decline[d] any changes." *Id.*

### ii.    Analysis

Plaintiff contends the ALJ failed to provide specific, clear, and convincing reasons supporting his conclusion that Plaintiff shows no signs of acute behavioral problems, communications deficits, or impaired thought processes or proceeding speed[3]— particularly when the ALJ found Plaintiff "*consistently* showed signs of depressed and anxious moods with memory problems, blunted affect slow motor activity, monotone speech, paranoia, poor insight or judgment, indicia of auditory hallucinations, as well as episodes of disorganized or tangential thoughts and concentration problems." [ECF No. 17 at 27]; *see* AR 21. Plaintiff asserts the ALJ and Defendant improperly relied on a few normal findings in Plaintiff's medical records that do not constitute examples of broader development in violation of the Ninth Circuit's directive in *Garrison v. Colvin*, 759 F.3d 995 (9th Cir. 2014). [ECF No. 17 at 31.]

In *Garrison*, the ALJ discredited Garrison's mental health testimony on the grounds that the record showed improved condition at a few points throughout treatment. *Garrison*, 759 F.3d at 1016–17. The Ninth Circuit cautioned "while discussing mental health issues, it is error to reject a claimant's testimony merely because symptoms wax and wane in the course of treatment." *Id.* at 1017. "Cycles of improvement and debilitating symptoms are

---

[3] Plaintiff does not dispute the ALJ's findings regarding no "loss of orientation" or "active suicidal or homicidal ideation." *See* AR 21.

a common occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working." *Id.* In addressing the ALJ's reasons for discrediting Garrison's testimony, the Ninth Circuit found that "the ALJ improperly singled out a few periods of temporary well-being from a sustained period of impairment and relied on those instances to discredit Garrison." *Id*. at 1018. The Ninth Circuit instructed "[w]hile ALJs obviously must rely on examples to show why they do not believe that a claimant is credible, the data points they choose must *in fact* constitute examples of a broader development to satisfy the applicable 'clear and convincing' standard." *Id.* (emphasis in original). The Ninth Circuit held the ALJ's selective citations to periods of improvement did not offer specific, clear, and convincing reasons for rejecting Garrison's testimony concerning her physical and mental impairments. *Id*. ("In fact, the reasons given by the ALJ not only fail this demanding standard, but also would fail a far more forgiving inquiry, as they are plainly belied by the record and rest upon mischaracterizations of Garrison's testimony.").

The Court finds *Garrison* instructive in this case. Having reviewed the administrative record in detail and, in particular, the treatment records relied on by the ALJ to support his reasons for discrediting Plaintiff's subjective statements, the Court finds the ALJ's stated reason for rejecting or discounting plaintiff's credibility—that Plaintiff "consistently appeared grossly mentally normal and stable, showing no signs of acute behavioral problems, communication deficits, loss of orientation, [or] impaired thought processes or processing speed"—is belied by the record and does not constitute a clear, convincing, and specific ground supported by substantial evidence for discounting Plaintiff's symptom testimony. Like in *Garrison*, some symptoms appear to have remained a constant source of impairment (*e.g.*, auditory hallucinations, paranoia, depression, anxiety,); some symptoms persisted the whole period (*e.g.*, memory problems, flat or blunted affect); and some symptoms came and went (poverty of thought or speech, visual hallucinations, disorganized thoughts, poor eye contact). Plaintiff's diagnoses of

schizoaffective disorder (bipolar type), depression and anxiety, and cannabis use disorder remained constant across all treatment records. The ALJ appears to have singled out a few findings within mental status exams and ignored significant others like ongoing auditory hallucinations and paranoia to conclude Plaintiff "consistently appeared grossly mentally normal . . . showing no signs of acute behavioral problems, communication deficits . . . [or] impaired thought processes or processing speed." *See* AR 21.

Defendant identifies several purported examples of "valid" reasons for the ALJ to discount Plaintiff's subjective testimony, such as AR 21, 493, 517, 524, 530, 533 [See ECF No. 17 at 14–15, 30.] The ALJ, however, did not provide such an explanation. *See Garrison,* 759 F.3d at 1010 (The Court may "review only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely."). Specifically, the ALJ does not identify which part of Plaintiff's treatment records support his conclusion that Plaintiff appeared grossly mentally normal, and despite the "Id." citation to the string cite of various treatment records, it is unclear how the ALJ found they support the ALJ's conclusion that Plaintiff appeared grossly mentally normal with no sign of acute behavior problems, communication deficits, or impaired thought processes or processing speed without any explanation. Moreover, in its briefing, Defendant acknowledges that at all points in time identified by Defendant, Plaintiff continued to experience ongoing auditory hallucinations, paranoia, depression, and anxiety, though such symptoms were only characterized as "mild" at times. [ECF No. 17 at 15.] This concession undermines the ALJ's conclusion that Plaintiff "consistently appeared grossly mentally normal" and showed "no signs of acute behavior problems, communication deficits, [or] impaired thought processes or processing speed."

In addition, Plaintiff's treatment records, including those identified by Defendant, establish that Plaintiff consistently showed significant psychiatric and psychological impairments, which the ALJ even acknowledged. *See* AR 21. Specifically, the ALJ found Plaintiff "consistently showed signs of depressed and anxious moods with memory problems, blunted affect, slow motor activity, monotone speech, paranoia, poor insight or

judgment, and indicia of auditory hallucinations, as well as episodes of disorganized or tangential thoughts and concentration problems." *Id.* Plaintiff's ongoing auditory hallucinations and paranoia is documented in every treatment record relied on by the ALJ, though the intensity of such symptoms ranged from mild to significant. While the treatment records note Plaintiff was "stable" numerous times, such references do not support the ALJ's conclusion that Plaintiff had no signs of various symptoms or that such symptoms had resolved. For example, on September 9, 2020, Plaintiff was found to be "stable" though he was experiencing "tolerable" auditory hallucinations and paranoia, as well as depressed and anxious mood. AR 530–31. On July 23, 2021, the treatment records describe Plaintiff's response to his prescribed medications, Risperdal and Sertraline, as "fair," though they note Plaintiff only obtained partial relief for both psychosis and depression and anxiety, and he continued to experience "significant symptoms" including "continued and daily auditory hallucinations and paranoid delusions which keep [him] isolated and inside" as well as poor concentration and memory impairment. AR 548–49.

Further, numerous health care providers found Plaintiff had difficulty understanding as part of their examination and mental health findings. *See, e.g.*, AR 402, 417, 494. During the hearing, the ALJ also had to repeat numerous questions to Plaintiff while he was testifying, as it was clear Plaintiff either did not understand or was unable to respond coherently to the question posed. *See, e.g.*, AR 40, 42, 44. Plaintiff's impaired thought process and processing speed is also well documented in the medical records relied on by the ALJ. For example, on August 29, 2019, Clinician Michelle Pomeroy found Plaintiff presented with "difficulty understanding some questions" and "tangential thought process" and further found Plaintiff had poor abstraction, recent and remote memory, judgment and insight. AR 402, 416–17. On September 3, 2020, Clinician Vernette Christian found Plaintiff had limited insight and that he experienced "psychosis such as AH and PI daily that impair[ed] his ability to socialize, work, and complete ADLs." AR 493, 498. On December 27, 2019, Dr. Bunner found Plaintiff's thoughts were "mildly disorganized." AR 524. On July 23, 2021, the most recent treatment record in the administrative record, Dr.

Bunner found Plaintiff had "poverty of thought and speech," poor concentration, and his recent and remote memory were impaired. AR 548–49. While these are only a few examples of many others, they are representative of Plaintiff's treatment and are sufficient to establish that the ALJ's conclusion that Plaintiff "consistently appeared grossly mentally normal" and showed "no signs" of acute behavior problems, communication deficit, or impaired thought process is not supported by the record. The Court cannot find the ALJ's discounting of Plaintiff's subjective symptoms based upon the ALJ's conclusion to satisfy the clear and convincing standard.

### b.    Conservative Treatment

The ALJ's second reason for discounting Plaintiff's "statements concerning the intensity, persistence and limiting effects" of his symptoms was Plaintiff's "psychological symptoms were treated conservatively with outpatient psychotherapy and psychotropic medications." AR 21. The ALJ continued: "[a]lthough he reportedly has a history of multiple psychiatric hospitalizations in the past, the claimant did not require any emergency or inpatient psychiatric treatment for psychological symptoms during the period under adjudication due to his compliance with his psychotropics." AR 21.

Plaintiff argues the ALJ does not explain or support his conclusion that the combination of therapy and antipsychotic medication is "conservative." The Court agrees.

Plaintiff's medical records show he has been under the continuous care of mental health professionals, including in person or telephonic psychiatric appointments, since 2016. *See* AR 393–549. As part of this ongoing care, Plaintiff has been prescribed anti-psychotropic and anti-anxiety and depression medications including Risperdal (Risperidone), Sertraline, Abilify, Quetiapine, Depakote, Ziprasidone, and Olanzapine. AR 393. The Ninth Circuit and district courts alike have recognized that prescription of psychiatric medication for mental health impairments—including many of the same medications prescribed to Plaintiff—is not indicative of conservative treatment. *See, e.g., Drawn v. Berryhill*, 728 F. App'x 637, 642 (9th Cir. 2018) ("the ALJ improperly characterized Drawn's treatment as 'limited and conservative' given that she was

23

prescribed a number of psychiatric medications"); *Baker v. Astrue*, No. ED CV 09-01078, 2010 WL 682263, at *1 (C.D. Cal. Feb. 24, 2010) ("Much treatment of mental disorders involves medication management, and it is unpersuasive to call this 'conservative treatment' . . . Where mental activity is involved, administering medications that can alter behavior shows anything but conservative treatment."); *Carden v. Colvin*, No. CV 13-3856, 2014 WL 839111, at *3 (C.D. Cal. Mar. 4, 2014) ("Courts specifically have recognized that the prescription of several of these medications connotes mental health treatment which is not 'conservative,' within the meaning of social security jurisprudence" including Depakote and Risperdal); *James N. v. Saul*, No. ED CV 18-1199, 2019 WL 3500332, at *6 (C.D. Cal. July 31, 2019) ("the Court concurs with other district courts that have found antipsychotic medications such as Risperidone do not qualify as routine or conservative treatment"); *Powers v. Kijakazi*, No. 20-CV-01399, 2021 WL 5154115, at *10 (D. Nev. Nov. 4, 2021) (finding prescription medications including Risperidone (i.e., Risperdal) and Sertraline HCI (i.e., Zoloft) were not conservative treatment, and the ALJ erred in concluding otherwise).

Furthermore, Plaintiff's prescriptions were monitored in connection with his ongoing psychiatric care to address persistent symptoms, and his medication was carefully adjusted accordingly. *See, e.g.*, AR 393, 511–12 (adding Risperdal to get relief of ongoing paranoia and auditory hallucinations), 514 (decreasing Olanzapine and increasing Risperidone dosage "for paranoia, AH, and disorganized thoughts"); AR 517 (increasing Risperidone "for AH and paranoia"). Even after adjusting to Plaintiff's current prescription of Risperidone for psychosis and Sertraline for depression and anxiety, Plaintiff was found to have a "fair response to medication but continues to experience significant symptoms." AR 549 (finding Plaintiff gets "partial relief" of psychosis symptoms from Risperdal and "partial relief" of depression and anxiety symptoms from Sertraline).

In addition, the Court finds the ALJ erred by suggesting or implying that emergency or inpatient psychiatric treatment is required to constitute non-conservative treatment. *See Matthews v. Astrue*, No. EDCV 11-01075, 2012 WL 1144423, at *9 (C.D. Cal. Apr. 4,

2012) ("Claimant does not have to undergo inpatient hospitalization to be disabled. Indeed, the Ninth Circuit has criticized the use of lack of treatment to reject mental complaints, both because mental illness is notoriously under-reported and because it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation.") (citing *Regennitter v. Comm'r of Soc. Sec. Admin.*, 166 F.3d 1294, 1299–1300 (9th Cir. 1999)); *Laura C. v. Kijakazi,* No. 22-CV-02861, 2023 WL 6304852, at *6 (C.D. Cal. Sept. 26, 2023) ("The mere lack of psychiatric hospitalization, however, is insufficient to constitute conservative treatment.")

The Court cannot find the ALJ's discounting of Plaintiff's subjective symptoms based upon a supposed "conservative treatment" regimen to be clear and convincing.

**B.    Whether the ALJ Properly Evaluated the Medical Opinions of Treating Psychiatrist Scott Bunner, M.D., and Consultative Examine Madhumalti Bhavsar, M.D.**

Next, Plaintiff asserts the ALJ improperly disregarded the medical opinions of (1) treating psychiatrist Dr. Bunner and (2) consultative examiner Dr. Bhavsar. [ECF No. 17 at 6.] The Court addresses each in turn.

1.    <u>Applicable Law</u>

Plaintiff's claim is subject to the 2017 amendments governing the evaluation of medical opinions because it was filed after March 27, 2017. 20 C.F.R. § 416.920c. The revised regulations eliminated the deference given to medical opinions from treating or examining physicians. *Woods,* 32 F.4th at 787, 792 (citing 20 C.F.R. § 404.1520c(a)); *see also* 20 C.F.R. § 416.920c(a). "The new regulations require an evaluation of the 'persuasiveness' of medical opinions based on the following factors: supportability, consistency, relationship factors, specialization, and "other factors." *Marie S. v. Kijakazi*, No. 20-CV-2196, 2023 WL 2265227, at *4 (S.D. Cal. Feb. 28, 2023), *report and recommendation adopted*, No. 20-CV-2196, 2023 WL 2637388 (S.D. Cal. Mar. 24, 2023) (citing 20 C.F.R. § 416.920c(c)(1)–(5)).

"'The most important factors' that the agency considers when evaluating the persuasiveness of medical opinions are 'supportability' and 'consistency.'" *Woods*, 32 F.4th at 791 (quoting 20 C.F.R. § 404.1520c(a)); *see also* 20 C.F.R. § 416.920c(a). "Supportability means the extent to which a medical source supports the medical opinion by explaining the 'relevant . . . objective medical evidence." *Woods*, F.4th at 791–92 (citing 20 C.F.R. § 404.1520c (c)(1)); *see also* 20 C.F.R. § 416.920c(c)(1). Under the new regulations, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . the more persuasive the medical opinions . . . will be." 20 C.F.R. § 416.920c(c)(1). "Consistency means the extent to which a medical opinion is 'consistent . . . with the evidence from other medical sources and nonmedical sources in the claim.'" *Woods*, F.4th at 792 (citing 20 C.F.R. § 404.1520c(c)(2)); *see also* 20 C.F.R. § 416.920c(c)(2). "The more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) . . . will be." § 416.920c(c)(2). Under the new regulations, supportability and consistency are the only two factors that the ALJ *must* specifically explain in the decision. § 416.920c(b)(2).

"The revised regulations recognize that a medical source's relationship with the claimant is still relevant when assessing the persuasiveness of the source's opinion." *Woods*, 32 F.4th at 792 (citing 20 C.F.R. § 404.1520c(c)(3)); *see* § 20 C.F.R. 416.920c(c)(3). However, the revised regulations specifically provide the ALJ may, but is not required to, explain the relationship factors. *See* 20 C.F.R. § 416.920c(b)(2); *Woods*, 32 F.4th at 792 ("However, the ALJ no longer needs to make specific findings regarding these relationship factors.").

"Even under the new regulations, an ALJ cannot reject an examining or treating doctor's opinion as unsupported or inconsistent without providing an explanation supported by substantial evidence." *Woods*, 32 F.4th at 792. The ALJ must articulate "how persuasive" it finds "all of the medical opinions" from each doctor or other source, 20

C.F.R. § 416.920c(b), and "explain how [it] considered the supportability and consistency factors" in reaching these findings. *Id.*; *see also* 20 C.F.R. § 416.920c(b)(2).

       2.  <u>Scott Bunner, M.D.</u>

Psychiatrist Dr. Scott Bunner, M.D., has treated Plaintiff on an ongoing basis since approximately September 2016. AR 393.

In the "Medical Source Statement" dated August 29, 2019, AR 393–97, Dr. Bunner opined that Plaintiff had "paranoia and delusions that keep him isolated at home and unable to shop for food, daily auditory hallucinations, poverty of thought, depression, mood swings, crying spells," and his psychosis had not responded to many medications. AR 393, 396. In the "Mental Disorder Functional Limitations" section in which the provider is asked to check the applicable boxes, Dr. Bunner opined that Plaintiff has extreme functional limitations in all four areas of mental functioning: understand, remember or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. AR at 394–95. In particular, Dr. Bunner found Plaintiff had extreme limitations in: following one or two step oral instructions to carry out a task; describing work activities for someone else; asking and answering questions and providing explanations; recognizing a mistake and correcting it; identifying and solving problems; sequencing multi-step activities; using reason and judgment to make decisions; cooperating with others; asking for help when needed; handling conflicts with others; stating his own point of view; initiating or sustaining conversation; understanding and responding to social cues; responding to requests, suggestions, criticism, correction, and challenges; keeping social interactions free of excessive irritability, sensitivity, or suspiciousness; initiate and perform a known task; working at an appropriate and consistent pace; completing tasks in a timely manner; ignoring or avoiding distractions while working; changing activities or work settings without being disruptive; working close to or with others without interrupting or distracting them; sustaining an ordinary routine and regular attendance at work; working without extra or longer rest periods; responding to demands; adapting to changes; managing psychologically-based symptoms; distinguishing between acceptable and

unacceptable work performance; setting realistic goals; making plans for himself independently of others; and being aware of normal hazards and taking appropriate precautions. AR 394–95.

Dr. Bunner further opined that Plaintiff had marked functional limitations for understanding and learning terms, instructions, procedures, and moderate limitations for maintaining personal hygiene and attire appropriate to a work setting. *Id*. Dr. Bunner opined that he anticipated Plaintiff's impairments would cause absences from work more than three times a month, and when asked which impairments would cause the absences, Dr. Bunner opined that Plaintiff is "so paranoid he has difficulty leaving his home" and "only gets food because his roommate buys it and prepares it." AR. 396. Dr. Bunner further opined that he anticipated Plaintiff would be off-task in the workplace due to his mental health symptoms more than twenty percent (more than twelve minutes an hour). *Id.* Dr. Bunner further opined that Plaintiff's psychosis had not responded to many medications and documented side effects included sedation. AR 396–97. Finally, Dr. Bunner opined that Plaintiff's conditions meet the "Paragraph C" criteria because he has a "medically documented history of a serious and persistent neurocognitive, psychotic, or affective disorder of at least two years duration with both . . . [a] Medical treatment, mental health therapy, psychosocial supports, or a highly structured setting[] that is ongoing and that diminishes the symptoms or signs of the mental disorder; and [b] Marginal adjustment, meaning a minimal capacity to adapt to change in the environment that are not already part of daily life." AR 397.

Dr. Bunner also provided a "Medical Source Statement" dated March 17, 2021 that is consistent in substantial part with his previous opinion. AR 535–39. Dr. Bunner noted that Plaintiff had "chronic daily auditory hallucinations, paranoid delusions, depression, poor initiative, poor focus, poor insight, poverty of thoughts" and that he "only ha[d] partial response" to his medications, Risperdal and Sertraline. AR 535. In the "Mental Disorder Functional Limitations" section, Dr. Bunner opined Plaintiff's limitations were consistent with his previous findings, except Plaintiff now had marked limitations (rather than

extreme) for following one or two step oral instructions to carry out a task and now had extreme limitations (rather than moderate) for maintaining personal hygiene and attire appropriate to a work setting. AR 536–37. Consistent with his previous opinion, Dr. Bunner opined Plaintiff's impairments would result in more than three absences from work per month and cause Plaintiff to be off-task in the workplace more than twenty percent. AR 538. Dr. Bunner further opined that Plaintiff still met the "paragraph C" criteria. AR 539.

Dr. Bunner provided a Treating Source Statement dated May 21, 2021, opining that Plaintiff's cannabis and alcohol use "especially in the past year [was] so minimal" it was having "little to no impact" on the Plaintiff's mental health, meaning the diagnosis and his functional capabilities would not change "even if there was no use." AR 541.

a.    The ALJ Found Dr. Bunner's Opinions Unpersuasive

In discrediting Dr. Bunner's opinion that Plaintiff's condition meets "paragraph C" criteria, the ALJ found "these opinions [were] unpersuasive because, as addressed in greater detail below, the claimant did not consistently present with acute adaptive deficits during treatment, and his treatment history during the period under adjudication was conservative and routine." AR 19.

In considering the RFC, the ALJ identified three reasons for finding Dr. Bunner's opinions unpersuasive. First, the ALJ found Dr. Bunner's opinions were "unsupported by the mental status exam findings in the record, which do not show consistent signs of gross social, cognitive, or adaptive deficits warranting a finding of marked or extreme limitations in any area of mental functioning." AR 21. The ALJ continued that "[i]t appears these opinions were based primarily on the claimant's subjective statements, as the supporting findings listed in the opinions were not corroborated in the author's treatment notes." AR 21–22. Second, the ALJ concluded "these opinions are inconsistent with the claimant's conservative and routine treatment for psychological symptoms during the period under adjudication." AR 22. Finally, the ALJ found Dr. Bunner's "conclusion that the substance use had only a minimal impact on mental functioning also appears inconsistent with

notations in treatment notes that the substance use exacerbates the claimant's psychosis and impulse control."[4] AR 22.

### b.    The Parties' Arguments

Plaintiff contends the ALJ erred in rejecting Dr. Bunner's opinion by (1) failing to provide specific and legitimate reasons to reject a treating physician's testimony; (2) improperly concluding Dr. Bunner's findings are inconsistent with his treatment records without any citations to the record to support his findings; and (3) improperly concluding Dr. Bunner's opinion is inconsistent with Plaintiff's "conservative and routine treatment." [*See* ECF No. 17 at 9–12.]

Defendant contends the ALJ was not required to provide specific and legitimate reasons under the new regulations, as recognized in *Woods v. Kijakazi*, 32 F.4th 785 (9th Cir. 2022). Defendants further asserts the ALJ reasonably found Dr. Bunner's opinions unsupported by or inconsistent with his normal mental status findings and conservative treatment. [ECF No. 17 at 15–17.]

### c.    Analysis

The Ninth Circuit's decision in *Woods* forecloses Plaintiff's argument that an ALJ may not reject a treating physician's opinion without specific and legitimate reasons. *Woods* expressly held "[t]he revised social security regulations are clearly irreconcilable with our caselaw according special deference to the opinions of treating and examining physicians on account of their relationship with the claimant." *Woods*, 32 F.4th at 792 (citing 20 C.F.R. § 404.1520c(a) ("We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) . . ., including those from your medical sources.")); *see also* 20 C.F.R. § 416.920c(a) (same). The Ninth Circuit specifically found the "specific and legitimate reasons" requirement for rejecting certain doctor's opinions was "incompatible" with the new regulations:

---

[4] Plaintiff does not dispute this finding. [*See* ECF No. 17 at 9–12, 17–20.]

1
2
3
4
5

> Our requirement that ALJs provide "specific and legitimate reasons" for rejecting a treating or examining doctor's opinion, which stems from the special weight given to such opinions, . . . is likewise incompatible with the revised regulations. Insisting that ALJs provide a more robust explanation when discrediting evidence from certain sources necessarily favors the evidence from those sources—contrary to the revised regulations.

6   *Woods*, 32 F.4th at 792 (internal citation omitted).

7        The Ninth Circuit emphasized, however, that "[e]ven under the new regulations, an
8   ALJ cannot reject an examining or treating doctor's opinion as unsupported or inconsistent
9   without providing an explanation supported by substantial evidence." *Id*. The ALJ must
10  "'articulate . . . how persuasive' it finds 'all of the medical opinions' from each doctor or
11  other source, 20 C.F.R. § 404.1520c(b), and 'explain how [it] considered the supportability
12  and consistency factors' in reaching these findings, *id.* § 404.1520c(b)(2)." *Id*.; *see also*
13  416.920c(b). Accordingly, the Court applies this standard when evaluating whether the
14  ALJ properly found the medical opinions unpersuasive.

15       Plaintiff argues that the ALJ used boilerplate, copied, and pasted conclusions
16  without any citations to the record to support his finding that Dr. Bunner's opinions were
17  "unsupported by mental status exam findings in the record, which do not show consistent
18  signs of gross, social, cognitive, or adaptive deficits warranting a finding of marked or
19  extreme limitations in any area of mental functioning." [ECF No. 17 at 9 (citing AR 21).]
20  Specially, Plaintiff contends the ALJ does not cite any normal mental status examination
21  findings to support this statement, and the mental status examinations consistently showed
22  overtly abnormal findings. [*Id.*]

23       In response, Defendant argues that the ALJ reasonably found the opinions
24  unsupported by and inconsistent with Dr. Bunner's mental status findings in the record and
25  noted his opinions appeared to be based primarily on Plaintiff's subjective statements
26  because the supporting findings listed in the opinions were not corroborated in Dr.
27  Bunner's treatment notes. [*Id.* at 15–17.] Defendant then attempts to identify various
28  instances to support the ALJ's finding, for example that Dr. Bunner stated that Plaintiff's

paranoid delusions kept him isolated at home, unable to leave the home, and unable to shop for food, though Plaintiff went to swap meets and the store in October and December 2019. [*Id.* at 16.] Defendant further contends that "contrary to Dr. Bunner's contention that medications were not helpful, Plaintiff told Dr. Bunner that his symptoms were stable/tolerable on his medication regime." [*Id.* at 16–17.]

The difficulty with applying Defendant's reasoning is the ALJ did not provide it, and the Court cannot affirm on grounds not relied on by the ALJ. *See Garrison*, 759 F.3d at 1010. The ALJ found Dr. Bunner's opinions were "unsupported by the mental status exam findings in the record, which do not show consistent signs of gross social, cognitive, or adaptive deficits warranting a finding of marked or extreme limitations in any area of mental functioning" and were "not corroborated in the author's treatment notes." AR 21–22. However, the ALJ's opinion does not explain, with citations to the administrative record or otherwise, what inconsistencies it found between Dr. Bunner's opinions and the medical exam findings or what aspects of his opinions the ALJ found were unsupported by the treatment notes. *See Woods*, 32 F.4th at 792 ("Even under the new regulations, an ALJ cannot reject an examining or treating doctor's opinion as unsupported or inconsistent without providing an explanation supported by substantial evidence."). The Court cannot find the ALJ's blanket rejection of Dr. Bunner's opinions was supported by substantial evidence.

Moreover, the examples offered by Defendant do not show inconsistencies between Dr. Bunner's opinions and either the mental status exam findings or his treatment notes. The treatment records, both from Dr. Bunner and other medical providers, support Plaintiff's ability to leave his home for limited outings with his caretaker, such as attending swap meets or going to the store to shop for food, fluctuated with the severity of his symptoms. For example, on August 1, 2019, Dr. Bunner noted Plaintiff went to swap meets with his friend/caretaker but was "distracted there by frequent AH and music hallucinations." AR 517. The psychiatric exam found Plaintiff's mood was mildly depressed and anxious, his affect was restricted, and Plaintiff was experiencing mild

auditory hallucinations and paranoia. *See id.* The following visit on August 29, 2019, Dr. Bunner found Plaintiff had "more paranoia" and noted that Plaintiff would no longer go to the swap meet with his caretaker due to paranoia of shootings. AR 519. The psychiatric exam found Plaintiff was depressed and anxious, had flat affect, was experiencing "usual" auditory hallucinations and paranoia, and had "poverty of thought," though Plaintiff demonstrated good eye contact. *Id.* While Defendant highlights that Plaintiff stated he went to swap meets in October 2019, Defendant omits that the same treatment records indicated Plaintiff's response to medication was "poor" as Plaintiff was experiencing "continued psychosis." AR 521–22. Defendant also ignores the support provided by Plaintiff's caretaker/friend in these outings, though it is well documented throughout the record. The Court finds Plaintiff's ability to attend occasional swap meets is not inconsistent with Dr. Bunner's opinion, particularly when—as here—Plaintiff was accompanied by his caretaker/friend.

In attempting to identify another inconsistency to support the ALJ's conclusion, Defendant argues that Dr. Bunner found Plaintiff's medications were "not helpful," yet Plaintiff told Dr. Bunner that his symptoms were tolerable on his medication regimen. [ECF No. 17 at 16–17.] Defendant misstates Dr. Bunner's opinion and the treatment records. Dr. Bunner opined that Plaintiff's "psychosis ha[d] not responded to many medications," AR 396, including numerous medications that Plaintiff was no longer taking, such as Olanzapine. AR 393; *see e.g.*, AR 511–12 (adding Risperdal for paranoia and auditory hallucinations), 514 (decreasing Olanzapine and increasing Risperidone dosage "for paranoia, AH, and disorganized thoughts"). Dr. Bunner also found Plaintiff obtained only "partial relief" from psychosis and depression and anxiety from his prescribed medications of Risperdal and Sertraline, respectively. AR 548–49, 535. Dr. Bunner's observation that Plaintiff was stable on his medications is not inconsistent with his finding that Plaintiff only obtained partial relief of psychosis and depression/anxiety symptoms or that Plaintiff's reporting his remaining symptoms were "tolerable."

Defendant also argues the ALJ interpreted the medical evidence and cited to specific areas of the record earlier in his opinion when discrediting Plaintiff's subjective statements. [ECF No. 17 at 17.] As explained above, having reviewed the administrative record as a whole in detail, including the treatment records specifically relied on by the ALJ earlier in his opinion, the Court cannot find the ALJ's interpretation of the medical evidence is supported by substantial evidence.

Lastly, Plaintiff asserts the ALJ erred in discrediting Dr. Bunner's opinion because it was inconsistent with Plaintiff's "conservative and routine treatment" for psychological symptoms. As set forth above, the Court finds Plaintiff's treatment including ongoing psychiatric appoints and prescribed anti-psychotropic and anti-anxiety and depression medications including Risperdal and Sertraline was not conservative or routine treatment. The ALJ erred in concluding otherwise.

To summarize, the ALJ erred in discrediting Dr. Bunner's opinion as inconsistent with the mental status exam findings and uncorroborated by his treatment notes. It is not clear from the ALJ's opinion how the exam findings and notes were inconsistent with or not supportive of Dr. Bunner's opinions, and the ALJ's interpretation of the medical evidence earlier in his opinion is not supported by substantial evidence. *See* AR 21. The ALJ also erred in discrediting Dr. Bunner's opinion as inconsistent with Plaintiff's "conservative and routine" treatment. As a result, the Court cannot conclude the ALJ's finding of Dr. Bunner's opinion as unpersuasive is supported by substantial evidence.

### 3.   Madhumalti Bhavsar, M.D.

Psychiatrist Dr. Madhumalti Bhavsar, M.D., performed a consultative psychiatric examination of Plaintiff on March 1, 2020. AR 425–429.

Dr. Bhavsar noted both Plaintiff's posture during the evaluation and his gait were normal. AR 425. As part of the mental status examination, Dr. Bhavsar noted Plaintiff was tense yet cooperative, his body movements were normal, and he had good eye contact. AR 427. Plaintiff's speech was normal in tone, volume, and rate, and it was clear and coherent. *Id*. Dr. Bhavsar found Plaintiff's "mood and affect was anxious," and he denied suicidal or

homicidal thoughts. *Id*. Dr. Bhavsar noted Plaintiff "did not exhibit looseness of association, thought disorganization, flight of ideas, thought blocking, tangentiality, or circumstantiality." *Id*. Dr. Bhavsar found Plaintiff "had paranoid and persecutory delusions," though she also noted that Plaintiff "had no bizarre or religious delusions" and "denied any thought broadcasting, thought insertion, phobias, obsessions, derealizations, or depersonalization." AR 428. Dr. Bhavsar also noted Plaintiff "denied any auditory, visual, olfactory, or tactile hallucinations." *Id*.

Dr. Bhavsar found Plaintiff was alert and "oriented to time, place, person, and purpose." *Id*. With respect to memory, Dr. Bhavsar noted that Plaintiff was able to recall three out of three objects immediately and one out of three objects in five minutes, what he ate for breakfast and dinner, and his birthdate. *Id.* Plaintiff was also "able to perform Serial 7s" and "Serial 3s" and was able to spell the word "music" forward and backward. *Id.* Dr. Bhavsar found Plaintiff was able to name three American presidents, and he responded to questions regarding similarities between two objects (apple and orange, bird and place, cat and dog, and radio and TV). *Id*. When asked the meaning of various proverb "don't judge a book by its cover," Plaintiff responded, "Don't judge it outside." *Id*. When asked for the meaning of "don't cry over spilled milk," Plaintiff responded, "I don't know." *Id*. When asked the meaning of the "grass is greener on the other side of the fence," Plaintiff responded, "Better over there." *Id*.

Dr. Bhavsar identified Plaintiff's diagnosis by DSM-5 as "Major Depression, Recurrent, Severe with Psychotic Feature (F33.3)" and "Generalized Anxiety Disorder (F41.1)." AR 429.

In the Functional Assessment, Dr. Bhavsar opined Plaintiff's ability to follow simple, oral and written instruction was not limited. *Id.* However, Plaintiff had marked limitations in the following functions: Plaintiff's ability to follow detailed instructions; to interact appropriately with the public, co-workers, and supervisors; to comply with job rules such as safety and attendance; to respond to changes in routine work setting; and to

respond to work pressure in a usual work setting. *Id*. Dr. Bhavsar also found Plaintiff's prognosis was "fair" and he was "competent to manage his own funds." *Id*.

### a.   The ALJ Found Dr. Bhavsar's Opinion Unpersuasive

The ALJ found Dr. Bhavsar's opinion was unpersuasive because it was "internally inconsistent with respect to the author's own findings from their exam" and "because the author's conclusions contradict each other, which undermines the reliability of the opinion." AR 22. The ALJ also found that "a finding of marked limitations in any area of mental functioning is inconsistent with the mental status findings in the treatment notes and with the claimant's conservative treatment history." *Id.*

### b.   Analysis

Plaintiff contends the ALJ erred in discrediting Dr. Bhavsar's opinion by: (1) improperly finding Dr. Bhavsar's opinion was internally inconsistent; and (2) improperly finding her opinion was inconsistent with treatment notes and Plaintiff's conservative treatment. [ECF No. 17 at 7–8.] Plaintiff also contends that the ALJ erred by failing to provide reasoning to support his conclusory statements as required by 20 C.F.R. § 416.920c. [*Id.* at 8.] Defendant contends the ALJ considered supportability and consistency of Dr. Bhavsar's opinion in accordance with the new regulations and reasonably found it unpersuasive. [*Id.* at 12.]

In finding Dr. Bhavsar's opinion was internally inconsistent, the ALJ explained:

> During the exam, the claimant showed signs of anxious mood, paranoia with persecutory delusions, and some memory problems, but he otherwise appeared psychologically unremarkable and his answers during sensorium and mental capacity testing were within normal limits. He also denied experiencing psychosis (either auditory or visual) during the exam, which is inconsistent with his testimony.

AR 22. The ALJ then found that despite Plaintiff's "mostly unremarkable presentation during this exam," Dr. Bhavsar concluded that Plaintiff "experienced marked social, cognitive, and adaptive limitations that curiously did not affect his ability to perform daily activities or manage his own finances." *Id*.

Plaintiff asserts the ALJ failed to explain his conclusion that Plaintiff "otherwise appeared psychologically unremarkable" particularly where he found Plaintiff showed signs of anxious mood, paranoia with persecutory delusions, and memory problems, and also incorrectly found Plaintiff's answers during sensorium and mental capacity testing were within normal limits. [ECF No. 17 at 12.] Defendant contends the normal portions of Dr. Bhavsar's exam speak for themselves—*e.g.*, Plaintiff was cooperative, had good eye contact, displayed normal speech, had a normal thought process, etc.—and the ALJ did not have to list them verbatim. [*Id.* at 13.]

While the Court finds it difficult to reconcile the ALJ's finding that Plaintiff "otherwise appeared psychologically unremarkable" when, as acknowledged by the ALJ, Dr. Bhavsar found Plaintiff "showed signs of anxious mood, paranoia with persecutory delusions, and some memory problems," the Court finds substantial evidence supports the ALJ's opinion given the "highly deferential" standard of review. *See Valentine*, 574 F.3d at 690. During the examination, Dr. Bhavsar found Plaintiff's speech was clear and coherent, and normal in tone, volume, and rate. AR 427. Dr. Bhavsar also found Plaintiff "did not exhibit looseness of association, thought disorganization, flight of ideas, thought blocking, tangentiality, or circumstantiality" during the exam. *Id.* Dr. Bhavsar found Plaintiff was alert and oriented to time, place, person, and purpose; he was able to recall three out of three objects, what he ate, and his birthdate; he was able to name three presidents and respond to questions regarding similarities between two objects. While Plaintiff emphasizes that he could recall only one out of three objects after five minutes, unable to articulate the meaning of multiple proverbs, and appeared tense on the exam, when considering Dr. Bhavsar's report as a whole, the Court finds substantial evidence supports the ALJ's findings in this regarding. *See Woods*, 32 F.4th at 788 ("Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld.") (quoting *Burch*, 400 F.3d at 679); *see also Ahearn v. Saul*, 988 F.3d 1111, 1115 (9th Cir. 2021) ("To determine whether substantial evidence supports the ALJ's determination, we must assess the entire record, weighing the evidence both supporting

and detracting from the agency's conclusion.") (citing *Mayes v. Massanari*, 276 F.3d 453 459 (9th Cir. 2001)).

Plaintiff also contends the ALJ erred in concluding that "a finding of marked limitations in any area of mental functioning is inconsistent with the mental status findings in the treatment notes and with the claimant's conservative treatment history." AR 22. Similar to Dr. Bunner addressed above, Defendant contends "the ALJ explained his interpretation of the medical evidence and conservative treatment at AR 21, and cited to specific areas of the record." [ECF No. 17 at 17.] The Court has already addressed the parties' arguments regarding the ALJ's interpretation of the medical evidence and conservative treatment in detail above and finds the ALJ erred for the same reasons. Moreover, given how pervasive the ALJ's errors in interpreting the medical evidence and erroneously concluding Plaintiff's treatment was "conservative" are to his opinion, including his discrediting of Dr. Bhavsar, the Court cannot conclude the ALJ's finding of Dr. Bhavsar's opinion as unpersuasive is supported by substantial evidence.

## C.   Whether The ALJ Adequately Supported His Finding That Plaintiff Did Not Meet Listing 12.03

"If a claimant has an impairment or combination of impairments that meets or equals a condition outlined in the 'Listing of Impairments,' then the claimant is presumed disabled at step three, and the ALJ need not make any specific finding as to his or her ability to perform past relevant work or any other jobs." *Lewis v. Apfel*, 236 F.3d 503, 512 (9th Cir. 2001) (citing 20 C.F.R. § 404.1520(d)); *see* 20 C.F.R. § 416.920(d). "An ALJ must evaluate the relevant evidence before concluding that a claimant's impairments do not meet or equal a listed impairment." *Lewis*, 236 F.3d at 512. "A boilerplate finding is insufficient to support a conclusion that a claimant's impairment does not do so." *Id.* (citing *Marcia v. Sullivan*, 900 F.2d 172, 176 (9th Cir. 1990)).

At step three, the ALJ found Plaintiff did not meet or equal the severity of one of the listed impairments in Social Security's Listing of Impairments 12.03, 12.04, 12.06, and 12.15. AR 18. The ALJ found because Plaintiff's "mental impairments do not cause at least

two 'marked' limitations or one 'extreme' limitation, the 'paragraph B' criteria [were] not satisfied." AR 19. [5] The ALJ reasoned as follows:

> In understanding, remembering, or applying information, the claimant has a moderate limitation. The claimant reported having difficulties with memory and understanding/following directions, which is supported by the medical opinion evidence and treatment notes showing manifestations of memory deficits and disorganized / tangential thoughts. However, the claimant often appeared grossly psychologically unremarkable and did not consistently show significant problems with comprehension or memory. The answers during the psychological consultative exam revealed no gross deficits in these mental activities, and the claimant's treatment for mental impairments during the period under adjudication was generally conservative and routine.

> In interacting with others, the claimant has a moderate limitation. The claimant reported experiencing problems with getting along with others, which is supported by the medical opinion evidence and treatment notes showing manifestations of anxious or depressed moods with episodes of abnormal affect and motor activity, as well as paranoia. However, the claimant often appeared grossly psychologically unremarkable and did not consistently show significant behavioral problems or communication deficits. The answers during the psychological consultative exam revealed no gross deficits in these mental activities, and the claimant's treatment for mental impairments during the period under adjudication was generally conservative and routine.

> With regard to concentrating, persisting, or maintaining pace, the claimant has a moderate limitation. The claimant reported having difficulties with concentration, which is supported by the medical opinion evidence and treatment notes showing manifestations of anxious or depressed moods with episodes of concentration deficits, disorganized / tangential thought processes, below average intellect, and memory deficits. However, the claimant often appeared grossly psychologically unremarkable and did not consistently show significant problems with concentration, processing speed, or thought processes. The answers during the psychological consultative exam

---

[5] *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, Part-A2, 12.00A.2.b ("To satisfy the paragraph B criteria, your mental disorder must result in 'extreme' limitation of one, or 'marked' limitation of two, of the four areas of mental functioning.") The four areas of mental functioning are "understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself." *Id.*

revealed no gross deficits in these mental activities, and the claimant's treatment for mental impairments during the period under adjudication was generally conservative and routine.

As for adapting or managing oneself, the claimant has experienced a moderate limitation. The claimant reported having difficulties with coping with stress and changes in routine, which is supported by the medical opinion evidence and treatment notes showing manifestations of anxious or depressed moods with episodes of impulsivity, poor insight or judgment, paranoia, auditory hallucinations, and poor abstraction. However, the claimant often appeared grossly psychologically unremarkable and did not consistently show significant deficits with insight or judgment, or loss of decision-making skills. The answers during the psychological consultative exam revealed no gross deficits in these mental activities, and the claimant's treatment for mental impairments during the period under adjudication was generally conservative and routine.

AR 18–19. The ALJ also found the evidence fails to establish "paragraph C" criteria were satisfied because there was "insufficient evidence to show that [Plaintiff] relie[d], on an ongoing basis, upon medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s), to diminish the symptoms and signs of the mental disorders" and that "the evidence also fails to establish that, despite [Plaintiff's] diminished symptoms and signs, [Plaintiff] ha[d] achieved only marginal adjustment." AR 19.

Plaintiff contends the ALJ erred when evaluating under the 12.00 Listings by (1) providing only boilerplate, conclusory statements without any supporting analysis or record citations; and (2) misstating the evidence. Defendant asserts that the ALJ reasonably found that Plaintiff's mental impairments did not meet and/or medically equal Listings 12.03, 12.04, 12.06, or 12.15. [ECF No. 17 at 21, 24.]

The reasons identified by the ALJ are substantially the same conclusions that the ALJ relied on throughout his opinion—(1) Plaintiff appeared "grossly psychologically unremarkable" and did not "consistently show significant problems" with comprehension, memory, behavior, communication deficits, concentration, processing speed, thought processes, insight or judgment, or loss of decision-making skills, (i.e., grossly mentally normal with no signs of acute behavioral problems, communications deficits, or impaired

thought processes or processing speed); (2) Plaintiff's answers during the psychological consultative exam revealed "no gross deficits in these mental activities" (i.e., Plaintiff's answers during sensorium and mental capacity testing were within normal limits); and (3) Plaintiff's treatment for mental impairments was "conservative and routine." *Compare* AR 18–19 *with* AR 21–22. The Court has already addressed all three reasons above and found the ALJ's first and third reasons are not supported by substantial evidence. Once again, given how pervasive the ALJ's errors in interpreting the medical evidence and erroneously concluding Plaintiff's treatment was "conservative" are to his opinion, the Court cannot conclude the ALJ's determination that Plaintiff did not meet the 12.00 Listings is supported by substantial evidence.

## V.   REMAND

Where, as here, the ALJ has erred, the Court must then consider whether the error was harmless, "meaning it was 'inconsequential to the ultimate nondisability determination.'" *Ford v. Saul*, 950 F.3d 1141, 1154 (9th Cir. 2020) (quoting *Tommasetti*, 533 F.3d at 1038); *see also Batson v. Comm'n Soc. Sec. Admin.* 359 F.3d 1190, 1197 (9th Cir. 2004) (finding error harmless where it did "not negate the validity of the ALJ's ultimate conclusion").

The ALJ's errors were not harmless. As Plaintiff contends, if the ALJ had found either Dr. Bunner or Dr. Bhavsar's respective opinions persuasive, Plaintiff would have met the SSA Listing 12.03 for Schizophrenia Spectrum and Other Psychotic Disorders. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, Part-A2, 12.00A.2.b ("To satisfy the paragraph B criteria, your mental disorder must result in 'extreme' limitation of one, or 'marked' limitation of two, of the four areas of mental functioning."). In addition, during the hearing, the vocational expert testified that a person with Plaintiff's RFC would be precluded from employment if either (1) off task for twenty (20) percent of the day in addition to their regularly scheduled breaks or (2) absent from for two workdays per month due to doctor's visits and symptoms. AR 57. Accordingly, had the ALJ found Dr. Bunner's opinion persuasive, it would have also found Plaintiff's limitations were work preclusive. *See id.*

In light of the ALJ's errors, the Court has discretion to either remand for further proceedings before the ALJ or remand for an award of benefits. *Garrison*, 759 F.3d at 1019. Where "additional proceedings can remedy defects in the original administrative proceeding, a social security case should be remanded." *Id.* (quoting *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981)); *see also Revels*, 874 F.3d at 668. "Conversely, where the record has been developed fully and further administrative proceedings would serve no useful purpose, the district court should remand for an immediate award of benefits." *Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004). The Ninth Circuit has recognized "[a]n automatic award of benefits in a disability benefits case is a rare and prophylactic exception to the well-established ordinary remand rule." *Leon v. Berryhill*, 880 F.3d 1041, 1044 (9th Cir. 2017); *see also Howland v. Saul*, 804 F. App'x 467, 471 (9th Cir. 2020).

Under the "credit-as-true" rule, a case may be remanded for an award of benefits where:

> (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand.

*Garrison*, 759 F.3d at 1020. The Ninth Circuit has recognized "it would be an abuse of discretion for a district court not to remand for an award of benefits when all of these conditions are met." *Id.*; *see also Varela v. Saul*, 827 F. App'x 713, 714–15 (9th Cir. 2020) (finding the district court abused its discretion where crediting the medical opinion as true, there was "no doubt" the plaintiff was disabled and explaining "given the ALJ's significant factual mistake, this case should not be remanded for more proceedings").

Each of these factors weighs in favor of a remand for an award of benefits. First, the record has been fully developed and includes Plaintiff's medical records and medical opinions from Plaintiff's treating physician and a consultative examiner. Defendant argues that further proceedings would serve the purpose of allowing the ALJ to resolve conflicts in the record and specifically identifies the opinions of Drs. Bunner and Bhavsar and

Plaintiff's subjective statements. [ECF No. 17 at 32–33.] However, the Ninth Circuit has rejected similar arguments, explaining "our precedent and the objectives of the credit-as-true rule foreclose the argument that a remand for the purpose of allowing the ALJ to have a mulligan qualifies as a remand for a 'useful purpose' under the first part of credit-as-true analysis." *Garrison*, 759 F.3d at 1021; *see also Benecke*, 379 F.3d at 595 ("Allowing the Commissioner to decide the issue again would create an unfair 'heads we win; tails, let's play again' system of disability benefits adjudication."). The Court finds no useful purpose would be served through further administrative proceedings.

The second factor weighs in favor of a remand for benefits because, as discussed above, the ALJ failed to provide legally sufficient reasons for discrediting Plaintiff's subjective statements and for finding the medical opinions of both Dr. Bunner and Dr. Bhavsar to be unpersuasive.

The third factor weighs in favor of a remand for benefits because had the ALJ adopted *either* Dr. Bunner or Dr. Bhavsar's opinions as true, Plaintiff's mental impairments would have been found to meet the Listing 12.03 at step three because the paragraph B criteria would have been satisfied by a finding "extreme" limitation of one area of mental functioning (Dr. Bunner) or "marked" limitations of two areas of mental functioning (Dr. Bhavsar). In addition, the vocational expert testified that Plaintiff would not be able to perform other jobs she had identified in connection with the ALJ's hypothetical that ultimately matched the ALJ's RFC determination if the limitations found by Dr. Bunner applied, namely either off task twenty (20) percent of the time or absent from work for two days per month due to medical treatment or symptoms. Plaintiff therefore would have been found disabled for this independent reason. Finally, the paragraph C criteria also would have been satisfied, as Dr. Bunner opined Plaintiff's mental impairments satisfied both requirements.

The Court finds all three factors of the credit-as-true analysis weigh in favor of remand for an immediate award of benefits. The Court must also consider whether "even though all conditions of the credit-as-true rule are satisfied, an evaluation of the record as

a whole creates serious doubt that a claimant is, in fact, disabled." *Garrison*, 759 F.3d at 1021 (relying on *Connett v. Barnhart*, 340 F.3d 871 (9th Cir. 2003)). Upon careful review of the entire record, the Court has found nothing in the record that would "create[] serious doubts" that Plaintiff is disabled. The Court recognizes that remand for further administrative proceedings is the "well-established ordinary remand rule" and thus appropriate in many cases and that an immediate award of benefits is considered a rare exception. *See Leon*, 880 F.3d at 1044. The Court finds the exception warranted in this case based on the foregoing analysis. Accordingly, the Court recommends the District Judge reverse the Commissioner's decision and remand for an immediate award of benefits.

## VI.    CONCLUSION AND RECOMMENDATION

The Court submits this Report and Recommendation to United States District Judge Linda Lopez under 28 U.S.C. § 636(b)(1) and Local Civil Rule 72.1(c)(1)(a) of the United States District Court for the Southern District of California. For the reasons set forth above, **IT IS HEREBY RECOMMENDED** that the District Judge issue an Order: (1) approving and adopting this Report and Recommendation, (2) reversing the Commissioner's decision, and (3) remanding for an immediate award of benefits.

**IT IS HEREBY ORDERED** that any party to this action may file written objections with the Court and serve a copy on all parties no later than **February 20, 2024**. The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any Reply to the Objections shall be filed with the Court and served on all parties no later than **March 5, 2024**.

**IT IS SO ORDERED**.

Dated:  February 5, 2024

HON. MICHELLE M. PETTIT
United States Magistrate Judge